United States Court of Appeals,

Eleventh Circuit.

No. 95-6142.

Gladys MOORE, Plaintiff-Appellee, Cross-Appellant,

v.

PENNSYLVANIA CASTLE ENERGY CORPORATION, Defendant-Appellant,
Cross-Appellee.

July 31, 1996.

Appeals from the United States District Court for the Northern
District of Alabama. (No. CV 93-C-2092-W), U.W. Clemon, Judge.

Before ANDERSON and COX, Circuit Judges, and RONEY, Senior Circuit
Judge.

ANDERSON, Circuit Judge:

In this diversity case involving Alabama law, Pennsylvania
Castle Energy Corporation ("Penn Castle") appeals from a final
judgment entered in the district court upon a jury verdict in favor
of plaintiff Gladys Moore. The issue raised by Penn Castle on
appeal concerns the introduction of parol evidence to vary the
terms of a written agreement, which Penn Castle claims is complete
and unambiguous. The cross-appeal by Moore raises the issue of the
dismissal of her claim for punitive damages.

Because we conclude that the district court erred in admitting
the parol evidence, we reverse the judgment entered in favor of
Moore. With respect the cross-appeal, we conclude that Moore's
claim for punitive damages was properly dismissed, and we therefore
affirm on that issue.

## I. FACTS

Moore owns the surface rights to several hundred acres of land
in Tuscaloosa County, Alabama; however, she does not own the

subsurface minerals and mineral rights.  In 1907, Moore's predecessor-in-interest conveyed by severance deed the title to all minerals in the land, along with certain rights to use the surface land in the extraction of the minerals.  Penn Castle is the lessee of the subsurface mineral estate and all rights appurtenant thereto.  Penn Castle acquired this leasehold interest by assignment from TRW, Inc. ("TRW") in 1990.

Under Alabama law and the terms of the severance deed, TRW had the right to enter and to make reasonable use of Moore's land to explore, develop, and produce subsurface minerals, including coalbed methane gas. *See, e.g., Vines v. McKenzie Methane Corp.,* 619 So.2d 1305 (Ala.1993).  Notwithstanding this right of reasonable surface use, Penn Castle presented evidence that producers in the Alabama coalbed methane industry often negotiate "surface access and surface damage agreements" with surface estate owners.  The purpose of such agreements is to avoid litigation by compensating surface estate owners for any damage that might be caused by the use of the surface property in the extraction of minerals.

In 1983, TRW became interested in drilling several wells on Moore's property, and in entering a surface access and surface damage agreement with Moore.  As negotiations progressed during the spring of 1983, TRW representatives met with Moore and spoke to her by telephone several times.  During this period, TRW sent Moore a map of her property, which indicated the locations of six proposed gas well drill sites.  On August 2, 1983, Moore and her son Gene Moore met with several TRW representatives at Moore's house, with

the map spread across a table. According to the trial testimony of Moore and her son, she and the TRW representatives reached an oral agreement after three hours of negotiation. The parties orally agreed to the following terms: (1) TRW would never drill more than six gas wells on Moore's property; (2) TRW would drill these gas wells in accordance with the six drill sites indicated on the map; and (3) TRW would never drill a gas well in a fifty-acre field on the Moore property (the "Field"). These three oral understandings were not reduced to writing that day.

On the next day, a TRW representative came to Moore's house and dropped off a proposed written contract. In this proposal, TRW promised to pay Moore $10,000 in exchange for a "perpetual easement with the right to construct six (6) drill sites for drilling and production of coalbed methane gas, construction of necessary access roads, installation of power lines and gathering systems and other coalbed methane gas recovery activity...." The $10,000 was to constitute "full and complete payment for any and all damages to and/or loss of trees and vegetation, easements and drill sites for six (6) coalbed methane gas wells." The locations of two of the six drill sites were specified in the written proposal. With respect to the four remaining drill sites contemplated, the written proposal provided as follows:

> It is agreed and understood that TRW will discuss with Surface Owner the easement and drill site locations for the remaining four (4) coalbed methane gas wells of which TRW has the final decision for location. Each of the four (4) drill sites will not exceed one (1) acre and the associated easement for the four (4) drill sites will not exceed three (3) net acres. Should additional easement be required, TRW will remunerate Surface Owner at the rate of Six Hundred Dollars ($600.00) per net acre.

Moore expressed disagreement about the last sentence of the above-quoted paragraph, and it was changed to read: "Should additional easement be required, TRW will remunerate Surface Owner at a rate to be negotiated per net acre."

On August 5, 1983, Moore and her son met with the TRW representatives again. After making and initialling a correction to a description of the location of "Well Site 1" in paragraph two, Moore signed the proposed contract (hereinafter, the "written agreement"). The written agreement includes the modified language in paragraph two, and an attached "Exhibit A," referred to in paragraph two, which more specifically describes the locations of the two drill sites and associated easements. The written agreement does not incorporate or otherwise refer to the map, nor does it mention TRW's oral promise never to drill more than six wells. The written agreement also does not mention the oral promise not to drill in the Field. To the contrary, the written agreement states that "TRW has the final decision for location" with respect to the four remaining drill sites contemplated by the written agreement. Nevertheless, Moore and her son testified that at the August 5, 1983, meeting, TRW representatives repeated the oral assurances that TRW would drill its gas wells only in accordance with the drill sites indicated on the map, and that it would never drill in the Field. After hearing these oral assurances, Moore signed the written agreement.

Between December of 1983 and August of 1984, TRW and Moore executed three supplemental letter agreements, each of which described an additional drill site on Moore's property (for a total

of five).  Although none of the supplemental letter agreements mentioned the map or the oral promise not to drill on the Field, all five of the drill sites chosen by TRW roughly corresponded to the sites on the map, and TRW did not drill on the Field.  TRW completed its drilling on the Moore property in late 1984, apparently without having chosen a sixth drill site.[1]

In 1990, TRW assigned its lease to the defendant, Penn Castle.  Beginning in October of 1992, a representative of Penn Castle contacted Moore in an effort to negotiate additional drill sites.  However, Moore and her son told Penn Castle that they were not amenable to additional wells.  Several subsequent attempts to negotiate additional drill sites failed.  Unable to reach a compromise, Penn Castle began constructing an access road and drill pad in the middle of the Field on December 26, 1992.

## II. PROCEDURAL HISTORY

On August 24, 1993, Moore filed this action against Penn Castle in Alabama state court, stating claims for breach of oral contract and trespass.  Penn Castle removed the case to federal court based on diversity of citizenship.  *See* 28 U.S.C. § 1332.  The case proceeded to trial.

---

[1]However, Moore presented evidence at trial that a drill pad for a well located on a neighbor's property may have protruded partly onto the Moore property.  Moore argued that this counted as one of TRW's six wells, making the well drilled by Penn Castle in the Field the seventh.  Penn Castle, on the other hand, presented evidence to the contrary, and argued that the well in the Field was only the sixth well.

We need not resolve this controversy in order to decide this appeal.  Construing the facts in the light most favorable to Moore, we assume *arguendo* that the well in the Field constituted the seventh well.

During the trial, the district court admitted evidence of the oral conversations between Moore and TRW over Penn Castle's objection that such negotiations were merged into the written agreement. Penn Castle similarly objected to the admission of the map into evidence, but the district court overruled the objection.

At a break in the trial testimony, the district court considered Penn Castle's motion for judgment as a matter of law, which was based in part on the parol evidence rule. After hearing argument, the district court denied the motion, concluding "that there is a latent ambiguity in the contract, in the written contract, and that it is for the jury to determine whether there was a separate oral agreement." At the close of all the evidence, the district court summarily denied the motions for judgment as a matter of law by Moore and Penn Castle. However, the district court granted Penn Castle's motion for judgment as a matter of law as to Moore's claim for punitive damages.

On February 1, 1995, the jury returned a general verdict of $159,000 in favor of Moore, and the district court entered final judgment. Penn Castle repeated its arguments to the district court by filing a Rule 50(b) motion for judgment as a matter of law, or, in the alternative, a Rule 59 motion for new trial or remittitur. On February 13, 1995, the district court entered an order summarily denying Penn Castle's post-judgment motions. Penn Castle filed a notice of appeal from the $159,000 final judgment entered by the district court. Moore filed a notice of cross-appeal from the order of the district court granting Penn Castle's motion for judgment as a matter of law on her claim for punitive damages.

III. DISCUSSION

We address only one issue on appeal: whether the district court erred in permitting Moore to present evidence of her alleged oral agreement with TRW.[2] Under Alabama law, once the parties to a contract have reduced their agreement to writing, all prior statements, promises, and negotiations are merged into the resulting written document. *See Guilford v. Spartan Food Systems, Inc.,* 372 So.2d 7 (Ala.1979) (noting that it is presumed at law that "all prior negotiations are merged into the written contract, which purports to cover the entire transaction"). In the absence of fraud, mistake, or illegality, parol evidence is not admissible to explain, contradict, vary, add to, or subtract from the express terms of a complete and unambiguous written agreement. *See Lake Martin/Alabama Power Licensee Assoc., Inc. v. Alabama Power Co., Inc.,* 601 So.2d 942, 945 (Ala.1992).

Moore makes two arguments in support of the district court's admission of the evidence relating to her alleged oral agreement with TRW. First, she argues that the parol evidence bar does not apply because the written document is ambiguous. Second, she contends that the written document does not reflect the complete agreement of the parties, and that extrinsic evidence of their

---

[2]This issue is dispositive: Moore's entire case depends upon the oral promises allegedly made by TRW. Moore does not argue that Penn Castle breached any term of the written agreement. In addition, Moore offered no evidence, and makes no argument, that Penn Castle's use of her land was unreasonable, and thus not within the common-law right of reasonable use. Similarly, Moore's trespass claim also depends entirely on the alleged oral promises. Moore's only argument in support of her trespass claim is that the breach of the oral agreement automatically resulted in a trespass to her property.

"true agreement" is therefore admissible.  We address each of Moore's arguments in turn.

A. *Is the Written Agreement Ambiguous?*

Under Alabama law, extrinsic evidence relating to the alleged "true intent" of the parties is not admissible if the written document is clear and unambiguous. *See, e.g., Kerrigan v. Sherrer,* 535 So.2d 74, 75-76 (Ala.1988) ("[A]bsent a finding of ambiguity, it was improper for the trial court to consider evidence .. [of the alleged] true intentions of the parties...."); *Darling Shop of Birmingham v. Nelson Realty Co.,* 52 So.2d 211 (Ala.1951) ("[I]n the absence of ambiguity the court cannot interpret the contract but must take it as it is written.").  However, resort to parol evidence is proper to show that the contract language contains a "latent ambiguity." *Cathbake Investment Co. v. Fisk Electric Co., Inc.,* 700 F.2d 654, 656 (11th Cir.1983) (applying Alabama law). "An ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." *Thomas v. Principal Financial Group,* 566 So.2d 735 (Ala.1990).  If a latent ambiguity exists, parol evidence may be admitted for the purpose of explaining or clarifying the language revealed to be ambiguous, but not for the purpose of uncovering the parties' alleged "true intent." *See Gafford v. Kirby,* 512 So.2d 1356, 1363 (Ala.1987) (where a latent ambiguity exists, parol evidence is admissible "to clear up that ambiguity").  As the Supreme Court of Alabama explained:

> Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the intention of elucidating the meaning of the words employed; and in its admission, the line which separates evidence which aids the *interpretation* of what is in the instrument, from direct evidence of intention independent of the instrument, must be kept steadily in view; the duty of the court being, to declare the meaning of what is written in the instrument, not of what was intended to be written.

*Gibson v. Anderson,* 265 Ala. 553, 92 So.2d 692, 695 (1957) (quotations omitted).

Whether a written contract is ambiguous is a question of law for the court, subject to *de novo* review. *Vulcan Painters, Inc. v. MCI Constructors, Inc.,* 41 F.3d 1457, 1460 (11th Cir.1995); *Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.,* 622 So.2d 314, 316 (Ala.1993). In the instant case, Moore can point to no language in the written document which is revealed to be ambiguous by the extrinsic evidence. Nor did the district court point to any such language, either in its rulings or in its instructions to the jury. Our review of the written agreement persuades us that there is no language therein which the extrinsic evidence reveals to be ambiguous. Moreover, the interpretation urged by Moore is unreasonable. *See Orkin Exterminating Co., Inc. v. F.T.C.,* 849 F.2d 1354, 1362 (11th Cir.1988) (explaining that "[n]o latent ambiguity exists unless the contract is actually susceptible to the meaning contended for by a party" and rejecting an unreasonable interpretation of a written contract), *cert. denied,* 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989). Any interpretation of the contract prohibiting Penn Castle from drilling in the Field is unreasonable in light of the plain language of the written agreement, which leaves to Penn Castle the "final decision for

location" with respect to four of the wells. It is also unreasonable to interpret the contract as prohibiting Penn Castle from ever drilling more than six wells on the Moore property. The obvious purpose of the agreement is to prevent Moore from suing in tort for any damage caused by the drilling of six wells, not to eliminate Penn Castle's common-law right to make reasonable use of Moore's land in the extraction of subsurface minerals. We readily conclude that the latent ambiguity exception to the parol evidence rule does not apply.

B. *Is the Written Agreement Incomplete?*

Moore's second argument in support of the district court's admission of the parol evidence is that the parties did not intend the written instrument to embody their complete agreement. "The parol evidence rule is based upon the idea that a completely integrated writing, executed by the parties, contains all of the stipulations, engagements, and promises that the parties intended to make, and that all of the previous negotiations, conversations, and parol agreements are merged into the terms of the instrument." *Quimby v. Memorial Parks, Inc.,* 667 So.2d 1353, 1357 (Ala.1995) (quoting *Alfa Mutual Ins. Co. v. Northington,* 561 So.2d 1041, 1044 (Ala.1990)). In light of its purpose, "[t]he parol evidence rule ... does not apply to every contract of which there exists written evidence, but applies only when the parties to an agreement reduce it to writing, and agree or intend that the writing shall be their complete agreement." *Hibbett Sporting Goods, Inc. v. Biernbaum,* 375 So.2d 431, 434 (Ala.1979) (plurality opinion); *see also Quimby,* 667 So.2d at 1357. Accordingly, prior negotiations and

oral conversations merge into a resulting written instrument only if that instrument was actually intended to contain the parties' entire agreement. *See Hibbett,* 375 So.2d at 436 (plurality opinion); *I.H.M., Inc. v. Central Bank of Montgomery,* 340 So.2d 30, 33 (Ala.1976) ("[T]here was no error in allowing parol evidence where there is no doubt that the written instrument was not intended to reflect the full agreement between the parties."); *Alabama Power Co. v. Pierre,* 236 Ala. 521, 183 So. 665 (1938) ("[W]e think the parol agreement admissible upon the theory that it clearly appears the parties never intended that the written ... contract should express their full agreement."); *Southern Guaranty Ins. Co. v. Rhodes,* 46 Ala.App. 454, 243 So.2d 717, 721 (1971) ("[W]e must determine ... whether it was the intent of the parties that the written instrument embody all of the prior negotiations and represent the final jural act, or whether it represented only a part thereof and it was intended there be an additional, collateral and separate oral agreement.").

The question whether the parties have assented to a writing as a complete integration of their agreement is a question of law for the court, which is subject to the *de novo* standard of review. *Walley v. Bay Petroleum Corp.,* 312 F.2d 540, 544 (5th Cir.1963); *Hibbett,* 375 So.2d at 435; *Hartford Fire Ins. Co. v. Shapiro,* 270 Ala. 149, 117 So.2d 348, 353 (1960). To resolve this legal question, we must examine not only the written instrument itself, but also the conduct of the parties and the surrounding circumstances. *See Hibbett,* 375 So.2d at 435-36 (plurality opinion); *Southern Guaranty Ins. Co. v. Rhodes,* 46 Ala.App. 454,

243 So.2d 717, 721 (1971).  In *Hartford Fire Ins. Co. v. Shapiro,* 270 Ala. 149, 117 So.2d 348 (1960), the Supreme Court of Alabama adopted a three-part test to determine whether a collateral or separate oral agreement is admissible in addition to a written agreement:

> " "(1) The agreement must in form be a collateral one;  (2) it must not contradict express or implied provisions of the written contract;  (3) it must be one that parties would not ordinarily be expected to embody in the writing....' "

*Id.* at 353 (quoting *Mitchill v. Lath,* 247 N.Y. 377, 160 N.E. 646, 647 (1928));  *see also Alabama Farm Bureau Mut. Cas. Ins. Co. v. Haynes,* 497 So.2d 82, 83-84 (Ala.1986) (applying the three-part test articulated in *Hartford* );  *Southern Guaranty Ins. Co. v. Rhodes,* 46 Ala.App. 454, 243 So.2d 717, 722 (1971) (same).

Examining the written agreement itself, as well as the surrounding circumstances, we conclude that the written instrument was intended to be a complete integration of the parties' agreement.  Therefore, the alleged oral agreement between Moore and TRW merged into the written document as a matter of law.  Several considerations persuade us to reach this conclusion.

First, we note that the written agreement itself is a formal document that appears to embody all the terms of the parties' agreement with respect to the six wells, as opposed to an informal memorandum not purporting to be complete.  *Cf. I.H.M. v. Central Bank of Montgomery,* 340 So.2d 30, 33 (Ala.1976) (parol evidence held admissible because document at issue was intended only as an informal, preliminary memorandum of agreement). [3]  Also, Moore

---

[3]Moore points out that the written document does not contain an integration, or merger, clause, which states that the written

studied the written document and insisted upon certain changes before she agreed to sign it, which indicates that she recognized the importance of the written document in governing the parties' relationship. Moore's conduct also indicates that she had the opportunity to require TRW to put its alleged oral promises in writing.

Second, with respect to TRW's alleged oral promises relating to the location of the wells, we note that the written agreement directly addresses that same subject. The written agreement specifically describes the location of two wells, and provides that "TRW has the final decision for location" of the remaining four

document expresses the complete agreement of the parties and that all prior negotiations are merged into the written document. Basically, an integration clause "is a portion of a particular contract that restates the rationale of the parol evidence rule within the terms of the contract." *Environmental Systems, Inc. v. Rexham Corp.,* 624 So.2d 1379, 1383 (Ala.1993). The presence or absence of an integration clause may be a significant, although not a conclusive, factor in ascertaining whether the parties intended the written instrument to be a complete integration. *See, e.g., Chandler v. Lamar County Bd. of Educ.,* 528 So.2d 309, 313 (Ala.1988) (citing the absence of an integration clause as one reason for the court to examine parol evidence); *Colafrancesco v. Crown Pontiac-GMC, Inc.,* 485 So.2d 1131, 1133 (Ala.1986) (citing the presence of a merger clause as a reason to exclude parol evidence). *See also* II Farnsworth on Contracts § 7.3, at 204-07 (1990). Stated differently, the absence of a merger clause does not preclude a finding that a written contract constitutes an integration of the parties' entire agreement. *See, e.g., Jake C. Byers, Inc. v. J.B.C. Investments,* 834 S.W.2d 806, 813 (Mo.App.1992) ("The existence of a merger clause may be a strong indication the writing is intended to be complete, but its existence is not necessarily determinative. More important, the absence of a merger clause is likewise not determinative; the writing still may be complete on its face.") (citations omitted); *Braten v. Bankers Trust Co.,* 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983) ("In the absence of a merger clause, as here, the court must determine whether or not there is an integration by reading the writing in light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.") (quotation omitted).

wells. The alleged oral agreement that TRW would drill its wells only in accordance with the sites indicated on the map, and that TRW would never drill in the Field, is inconsistent with this language. If the parties wished to confine TRW to the drill sites shown on the map, then presumably they would have described all six sites (rather than just two) in the written agreement, and they would not have left the location of four of the sites to TRW's absolute discretion.

Third, we find that TRW's alleged oral promise never to drill more than six wells on the Moore property is not collateral to the written agreement, and therefore that this promise also merged into the written agreement. The purpose of the written agreement was to define the parties' rights and obligations with respect to TRW's contemplated extraction of methane gas from the Moore property. Accordingly, any forfeiture of TRW's common-law right to drill more than six wells would reasonably be expected to appear in the written document. Although Moore agreed to accept $10,000 as full payment for any damage which might be occasioned by TRW's construction and operation of six coalbed methane gas wells, nowhere in the written agreement does TRW trade away its common-law right to drill additional wells, if drilling such additional wells is reasonably necessary to extract the methane gas. We conclude that the parol evidence rule bars the admission of TRW's alleged oral promise never to drill more than six wells.

Before concluding, we pause to distinguish *Hibbett Sporting Goods, Inc. v. Biernbaum,* 375 So.2d 431 (Ala.1979), a case upon which Moore relies in her brief. In *Hibbett,* a plurality of the

Alabama Supreme Court reversed a trial judge's exclusion of testimony of an oral non-competition agreement between a lessor, a retail shopping center, and its lessee, a sporting goods store. Their lease, which included a merger clause, did not contain a covenant not to compete, and expressly stated that "there were no "restrictive covenants or exclusives in favor of Lessee.' " *Id.* at 434. However, the existence of the oral agreement was not disputed, and both parties stipulated that the lease was not a true and complete expression of their agreement. *Id.* at 436. Thus, the court reasoned that "[t]he parol evidence rule ... is based on the assumption that the written contract contains the full and exact agreement of the parties; but where admittedly it does not, the reason for the rule ceases." *Id.*

*Hibbett* is distinguishable from the case at bar, because Penn Castle does not concede the validity of the alleged oral agreement. Rather, Penn Castle maintains that the written documents express the entire agreement of the parties, and that the alleged oral agreement was merged. For that reason, *Hibbett* does not support the district court's admission of parol evidence in this case. *See Intercorp., Inc. v. Pennzoil Co.,* 877 F.2d 1524, 1531 (11th Cir.1989) (distinguishing *Hibbett* in a case where the parties disputed the validity of the oral agreement); *Hurst v. Nichols Research Group,* 621 So.2d 964, 968 (Ala.1993) (same).

## IV. CONCLUSION

Without the parol evidence admitted by the district court, Moore's breach of contract and trespass claims fail as a matter of Alabama law. Accordingly, the judgment of the district court that

was entered upon the jury verdict in favor of Moore is REVERSED. We REMAND the case to the district court for judgment to be entered for Penn Castle.

With respect to Moore's cross-appeal, the judgment of the district court dismissing her punitive damages claim is AFFIRMED.