[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10230

_____

D.C. Docket No. 1:12-cv-003500-KD-M

FAIRE FEAZ,

Plaintiff-Appellant,

versus

WELLS FARGO BANK, N.A., *et al.*,

Defendant-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(February 10, 2014)

Before CARNES, Chief Judge, DUBINA, Circuit Judge, and ROSENTHAL,[*]
District Judge.

---

[*] Honorable Lee H. Rosenthal, United States District Judge for the Southern District of
Texas, sitting by designation.

ROSENTHAL, District Judge:

We are asked in this appeal to interpret a covenant included in all contracts for home mortgage loans guaranteed by the Federal Housing Administration. The covenant requires borrowers to insure their homes against "any hazards for which Lender requires insurance" and to "also insure . . . against loss by floods to the extent required by" the Department of Housing and Urban Development, the Federal Housing Administration's parent agency. The issue is whether the covenant unambiguously permits mortgage lenders to require their borrowers to obtain flood insurance beyond the amount the agency requires. Courts have divided over this question. Some courts have found the covenant ambiguous because it does not clearly indicate whether the federally required flood-insurance amount is a minimum or a maximum. Other courts have held that the covenant unambiguously makes the federally required amount a minimum and allows lenders to require borrowers to have more flood insurance than federal law demands.

We join those courts finding that the covenant unambiguously makes the federally required flood-insurance amount the minimum, not the maximum, the borrower must have. As a result, the borrower in this case, plaintiff-appellant Faire Feaz, cannot prevail on her claims that her mortgage lender, defendant-appellee Wells Fargo Bank, N.A., breached the mortgage-loan contract and violated

2

extracontractual duties by requiring her to have more flood insurance than the amount set by federal law.  We therefore affirm the decision of the United States District Court for the Southern District of Alabama (Kristi K. DuBose, Judge) dismissing Feaz's complaint for failure to state a claim.  *See Feaz v. Wells Fargo Bank,* No. 12-0350-KD-M, 2012 WL 6677904 (S.D. Ala. Dec. 21, 2012), *adopting* 2012 WL 6680301 (S.D. Ala. Nov. 19, 2012).

## I.    The Issue

The contract-interpretation issue arises from the intersection of two federal statutes.  One is the National Housing Act ("NHA"), 12 U.S.C. §§ 1701, *et seq.*, intended to promote home ownership.  The other is the National Flood Insurance Act ("NFIA"), 42 U.S.C. §§ 4001–4129, which promotes affordable flood insurance.  *See* 42 U.S.C. §§ 4001(a), 4002(b).

The Housing Act authorized a new agency, the Federal Housing Administration ("FHA").  *See Korman v. Fed. Hous. Adm'r,* 113 F.2d 743, 745 n.5. (D.C. Cir. 1940) (citing Exec. Order No. 7058 (May 29, 1935), 12 U.S.C. § 1702).  The Department of Housing and Urban Development ("HUD") is the FHA's parent agency.  42 U.S.C. §§ 3534(a), 3535(a).  The Act confers on the Secretary of HUD the authority to prescribe terms for FHA-insured mortgage contracts.  12 U.S.C. §§ 1702, 1708(a)(1), 1709(a).

3

The Flood Insurance Act requires a minimum amount of flood insurance before a federal agency can provide "any financial assistance" for home purchases in areas that present "special flood hazards." 42 U.S.C. § 4012a(a). The Federal Emergency Management Agency ("FEMA") designates the "special flood hazards" areas for this purpose. For homes in an area designated as presenting "special flood hazards," the NFIA prohibits "regulated lending institutions" from "mak[ing], increase[ing], extend[ing], or renew[ing] any" mortgage unless the home is covered "by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under [the NFIA], whichever is less[.]" 42 U.S.C. § 4012a(b)(1)(A). The "maximum limit of coverage" under the NFIA is $250,000. 44 C.F.R. § 61.6.

When the FHA guarantees a mortgage loan for a home located in a designated special flood hazard area, HUD requires that the home be covered by flood insurance in "an amount at least equal to either the outstanding balance of the mortgage, less estimated land cost, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." 24 C.F.R. § 203.16a(c). HUD implements this regulation through a standard-form covenant, in language the Secretary prescribes for every FHA-insured mortgage-loan contract. *See* 54 Fed. Reg. 27,596, 27,601 (June 29, 1989) ("Mortgagees must use

4

the model form . . . , with only such adaptation as may be necessary to conform to state or local requirements.").  The covenant states:

> **Fire, Flood and Other Hazard Insurance**.  Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.

*Id.* at 27,604.  This covenant is included in millions of mortgage contracts across the country.  It does not vary by lender or borrower.

Despite the covenant's uniformity and ubiquity, courts have disagreed about its meaning.  The disagreement is over whether the words directing the borrower to have flood insurance "to the extent required by the Secretary" make the amount the Secretary requires a minimum that the lender can exceed or a maximum that limits what the lender can require.

Some district courts have held that the covenant permits a mortgage lender to require a borrower to obtain more flood insurance than the federally required amount.  District courts following this approach have held that a contract requiring a borrower to maintain flood insurance in an amount that covered the home's replacement value did not give rise to a claim for breach of the contract and have

5

granted motions to dismiss such claims.[1]  An evenly divided First Circuit Court of Appeals recently issued an en banc opinion adopting this approach, affirming the district court's decision and adopting the panel's dissenting opinion.  *See Kolbe v. BAC Home Loans Servicing LP*, No. 11-cv-10312(NMG), 2011 WL 3665394 (D. Mass. Aug. 18, 2011), *rev'd in relevant part*, 695 F.3d 111 (1st Cir. 2012) (Boudin, J., dissenting), *rev'd en banc*, — F.3d —, 2013 WL 5394192 (1st Cir. Sept. 27, 2013).

Other district courts have disagreed and held that the covenant is ambiguous.[2]  Under this approach, the federally required amount could be either a

---

[1]  *See, e.g.*, *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1044 (N.D. Cal. 2013) (agreeing with "Wells Fargo that Plaintiffs' excessive coverage claims are barred"); *McKenzie v. Wells Fargo Home Mortg., Inc.*, No. 11-cv-4965(JCS), 2012 WL 5372120, at *16 (N.D. Cal. Oct. 30, 2012) ("[A]s a matter of law, Defendants did not breach the contract by simply requiring coverage above the outstanding principal loan balance."); *LeCroix v. U.S. Bank, N.A.*, 11-cv-3236(DSD/JJK), 2012 WL 2357602, at *4 (D. Minn. June 20, 2012) ("There is, however, no conflict or ambiguity within the Hazard Provision. . . .  Therefore, the plain meaning of the hazard provision provides U.S. Bank discretion to set the applicable amount of flood insurance, and the complaint fails to state a claim for breach of contract.").

[2]  *See, e.g.*, *Casey v. Citibank, N.A.*, 915 F. Supp. 2d 255, 262 (N.D.N.Y. 2013) ("[I]t is reasonable to interpret the contract language to mean that [the borrower] need only maintain flood insurance coverage in an amount equal to the outstanding principal balance of his loan . . . ."); *Morris v. Wells Fargo Bank, N.A.*, No. 2: 11-cv-474(DSC), 2012 WL 3929805, at *7 (W.D. Pa. Sept. 7, 2012) ("Here, 'to the extent required by the secretary' in the third sentence reasonably can be read to set a floor or ceiling on the amount of required flood insurance coverage. . . .  In contrast, the third sentence can be interpreted to limit the amount of flood insurance to the lesser of the principal balance or the statutory cap. . . .  At the very least, plaintiff's interpretation is tenable and she has alleged sufficient facts to survive a Rule 12(b)(6) motion on her breach of contract claim."); *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1032 (D. Or. 2012) ("Because there are at least two plausible interpretations of the contract, the court finds that the contract is ambiguous.  Judgment on the pleadings, therefore, is inappropriate."); *Skansgaard v. Bank of Am., N.A.*, 896 F. Supp. 2d 944, 948 (W.D. Wash. 2011) ("Construing the language of the deed of trust in Plaintiff's favor and giving full meaning to all

ceiling or a floor. Courts following this approach have denied motions to dismiss and allowed the claims to proceed.

## II.    The Proceedings Below

The parties do not dispute the following facts. Feaz obtained a $61,928 FHA-insured mortgage from Magnolia Mortgage. FEMA had designated her home's location as a special flood hazard area. Feaz signed a standard-form FHA Model Mortgage contract. That contract included the "fourth uniform covenant" required by federal law. *See* 54 Fed. Reg. 27,596, 27,604 (June 29, 1989).

Feaz's mortgage contract also outlined how the monthly note and insurance payments were to be paid. Feaz was to include in each monthly payment the "premiums for insurance required under paragraph 4." The payment instructions continued:

> [in] any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for monthly charges by the

relevant provisions, Plaintiff has stated a claim for breach of contract."); *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 594 (E.D. Pa. 2011) ("I find that, considering the language of the mortgage, dismissal of the breach of contract claim is inappropriate.").

> Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

If the borrower failed to make required payments or failed to perform any other mortgage covenants, then the lender could "do and pay whatever [was] necessary to protect the value of the Property and [the] Lender's rights in the property, including payments" of hazard insurance. Amounts the lender spent to protect its interests became "an additional debt of [the Borrower] and [was to be] secured by th[e] Security Instrument."

Feaz obtained $63,000 in flood insurance when she took out the loan from her initial lender, Magnolia Mortgage. This was more than the loan's principal balance but less than the home's replacement value. Magnolia did not ask for a higher amount. In June 2003, Wells Fargo acquired the mortgage. Feaz renewed her flood insurance in the same $63,000 amount for the next four years, without any request for a higher amount.

In June 2007, after Feaz made her annual insurance renewal, Wells Fargo sent her a letter captioned "Flood Insurance Coverage Deficiency Notification." The letter required Feaz to increase her flood-insurance coverage to $250,000 or the home's replacement value, whichever was less. The letter warned Feaz that flood insurance in this amount would be force-placed if she did not get it herself and provide Wells Fargo proof that she had done so within 45 days.

8

Later that same month, Wells Fargo sent Feaz another letter captioned "Notice of Temporary Flood Insurance Placed by Lender Due to Deficient Coverage." That letter stated that Feaz had to increase her flood insurance to the amount of her home's replacement value. Feaz received another letter on July 26, 2007, warning her that flood insurance would be force-placed if she did not provide proof within 30 days that she had obtained the coverage. Feaz did not get the higher insurance. Wells Fargo did what it had warned in its deficiency-notification letters and force-placed the insurance, passing the premium cost to Feaz. This lawsuit followed.

Feaz alleged that by demanding more flood insurance than the Secretary of HUD requires and by force-placing the insurance when she failed to get it, Wells Fargo breached the mortgage contract, breached an implied covenant of good faith and fair dealing, breached certain fiduciary obligations, and unjustly enriched itself. The District Court granted Wells Fargo's motion to dismiss, and Feaz appealed. The United States appeared as an amicus, vigorously arguing that the covenant unambiguously allows mortgage lenders such as Wells Fargo to require a borrower to obtain more flood insurance than federal law requires, and that this is important to the goals of the federal housing policy.

## III.    Discussion

### A.    The Breach of Contract Claim

9

Feaz's breach of contract claim is grounded on the third sentence of the fourth uniform covenant. It states: "Borrower shall also insure all improvements on the Property . . . against loss by floods to the extent required by the Secretary." Feaz argues that it is reasonable to read these words as limiting the insurance amount Wells Fargo requires to the amount the Secretary requires. Because the Secretary of HUD requires flood-insurance coverage in the lesser of $250,000 or the loan's principal balance, Feaz argues that Wells Fargo cannot require her to get more flood insurance than her loan's principal balance, which is less than $250,000.

Feaz's arguments, and the contract-interpretation principles she invokes, fail to recognize the distinctive considerations that apply to interpreting standard-form contract language that the federal government requires to implement national statutory and regulatory schemes. When, as here, federal regulations implementing statutory requirements mandate that every contract of a certain type contain specified contract language drafted by the federal government, traditional principles of contract interpretation are supplemented by additional considerations. *See Kolbe*, 2013 WL 5394192, at *5–*6.

Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent. *Moore*

10

*v. Pa. Castle Energy Corp.*, 89 F.3d 791, 795–96 (11th Cir. 1996). That intent is derived from the objective meaning of the words used. *Id.* Extrinsic evidence of the parties' subjective understanding is not consulted unless the contract is ambiguous. *Id.* When a contract contains a uniform, standard-form provision required by the United States in every such contract across the country, two considerations supplement those general principles: interpretation of the provision cannot vary from place to place or from contract to contract; and the United States drafted the language to implement congressional directives. The individual contracting parties neither drafted the standard-form language nor had the authority to alter or omit that language through negotiation. The United States wrote the standard-form covenants and required them to be included, verbatim, in each FHA-insured mortgage-loan contract "with only such adaptation as may be necessary to conform to state or local requirements." *See* 54 Fed. Reg. 27,596, 27,601. Such required standard-form language must be consistently interpreted in every contract in which it appears.

Our precedent follows this approach. In a case interpreting boilerplate contract language required in trust indentures, we held that "uniform interpretation of standard contract language" was important because it "ensures effective functioning of our financial markets, and begets stability." *Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1298 (11th Cir.

2012) (citing *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982)).  The same is true of standard-form uniform contract language in federally insured mortgage loans.  Consistent interpretation of a standard-form contract provision required for all FHA-insured mortgage loans across the country is important to the effective and stable functioning of the mortgage market.

Our approach is also consistent with other courts in recognizing that individual contracting parties' intent is not determinative.  "Boilerplate provisions are . . . not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties."  *Sharon Steel*, 691 F.2d at 1048 (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 943 (5th Cir. 1981), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506 (1983)); *see also*, *Kolbe*, 2013 WL 5394192, at *5.[3]  Other courts also recognize that where, as here, the United States drafts standard-form covenants and mandates their inclusion in all contracts of a certain type to implement federal regulatory and statutory requirements, such standard mandatory covenants must be interpreted to achieve the purpose and

---

[3]  Our circuit precedent is consistent with the contract interpretation approach set out in the panel dissent in *Kolbe* and in the en banc opinion which adopted the dissent's reasoning and affirmed the district court.  *Kolbe*, 2013 WL 5394192, at *8 ("We agree with the contract interpretation offered by Judge Boudin in his panel dissent.  We adopt and incorporate Judge Boudin's reasoning . . . . *Kolbe*, 695  F.3d at 127–29 (Boudin, J., dissenting)).  Our circuit precedent is different from the approach taken in the separate opinion of the equally divided First Circuit en banc court in *Kolbe*.  *Kolbe*, 2013 WL 5394192, at *33 (Torruella, Lipez, Thompson, C.JJ.).  That approach emphasized the private nature of the contract and looked to the subjective understanding of the original mortgage lender and the borrower.  That approach fails to recognize that the language at issue is uniform across the country and does not vary with the identity or intent of the individual contracting parties.

policy behind the regulatory requirements behind those provisions.  *See, e.g., Ill. Steel Co. v. Baltimore & Ohio R.R. Co.*, 320 U.S. 508, 511, 64 S.Ct. 322 (1944); *Saavedra v. Donovan*, 700 F.2d 496, 499 (9th Cir. 1983); *see also Honeywell v. United States*, 228 Ct. Cl. 591, 595–96 (Ct. Cl. 1981).

When federal regulations require contracts to include a uniform covenant and prescribe its language, interpreting the covenant requires interpreting the regulations themselves.  As we do in construing statutes and regulations, we first look to the language to discern whether the meaning is clear in light of the context and purpose of the regulatory scheme.  *See Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) ("The starting point in statutory interpretation is the language of the statute itself. . . .  In determining whether a statute is plain or ambiguous, we consider the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (quotation omitted)).

This approach leads us to conclude that the uniform covenant on flood insurance is not ambiguous and that the only reasonable interpretation of Covenant 4 is that a mortgage lender may require the borrower to have more flood insurance than the HUD-determined minimum.

First, the text and traditional contract-interpretation principles.  The first two sentences of Covenant 4 allow the lender to set the required insurance amount for

13

"any hazards." The word "hazards" clearly includes floods. The third sentence of Covenant 4 adds a separate and independent requirement that the borrower maintain the federally required minimum amount of flood insurance in addition to — not in lieu of — what the lender requires. If the lender requires more than the HUD minimum, the borrower satisfies both by meeting the lender's required amount. If the lender requires less, the borrower must obtain the amount set by HUD. In other words, the federally required amount is necessary. But if the lender requires more, the federally required amount is not sufficient. Both the lender and HUD set minimum amounts of required flood insurance. Neither sets a ceiling.[4]

Other language in the mortgage contract supports this reading. Paragraph 7 of the standard-form mortgage contract allows the lender to "do and pay whatever is necessary" to "protect the value of the Property and Lender's rights" including payment of "hazard insurance" if the borrower "fails to perform" any of the covenants in the agreement. The "value of the Property" is not limited to the loan's principal balance. To the contrary, the lender's exposure to the risk of loss can, and often does, extend to the replacement value of the home. The United

---

[4] As Judge Boudin pointed out, the general interpretive canon that resolves conflicting specific and general provisions by making the specific provision control does not apply when, as here, there is no conflict. *See Kolbe*, 695 F.3d at 127 (Boudin, J., dissenting). The first and third sentences do not conflict because both HUD's and the lender's flood-insurance requirements are minimum requirements.

States has recognized a lender's interest in the full replacement value of the homes that secure payments of its debts. *See, e.g.,* 76 Fed. Reg. 64,175, 64,178 (Oct. 17, 2011) ("Lenders . . . need to be equally mindful of avoiding situations in which, as a result of insuring at a level below [replacement cost value], they under-insure property."); 74 Fed. Reg. 35,914, 35,936 (July 21, 2009) ("Lenders are permitted to require more flood insurance coverage than required by the regulation."); 54 Fed. Reg. 29,666, 29,672 (July 13, 198) ("[L]enders should be aware that . . . they have the discretion to require higher amounts of coverage than required by law if they consider it necessary to protect the full amount of their interest . . . .").

As Judge Boudin stated in his panel dissent in *Kolbe*, "[t]he bank's interest is obvious enough; it seeks not merely repayment of the outstanding balance but the maintenance of a loan on which it earns the designated interest for the period agreed to—a goal served by providing funds to restore a damaged house that might otherwise be abandoned." *Kolbe*, 695 F.3d at 126 (Boudin, Judge, dissenting). The lender's interest in a mortgage is not limited to the unpaid principal balance, but rather extends to the continued receipt of the interest payments over the lifetime of the loan. *See Lass v. Bank of Am., N.A.*, 695 F.3d 129, 143 (1st Cir. 2012) (Boudin, Judge, dissenting) ("[T]he lender has an interest both in the loan amount and in the stream of interest payments; both give it ample reason to insist

on insurance that goes beyond the unpaid balance of the loan and up to the replacement cost.").

The NFIA and FHA regulations support this reading as well. The National Flood Insurance Program ("NFIP") makes government-subsidized flood insurance available under special conditions. Without such a subsidy, flood insurance would be prohibitively expensive. For homes in areas that FEMA deems to present "special flood hazards," the NFIA requires federally regulated lenders to have their borrowers obtain flood insurance in an amount at least up to the loan's principal balance (or, if less, the maximum amount of NFIP insurance available for the property). Covenant 4 of the HUD-required uniform provisions for FHA-insured mortgages requires borrowers to obtain flood insurance "to the extent" HUD requires. HUD regulations require the mortgagor and mortgagee to "obtain and maintain" NFIP "flood insurance coverage on the property improvements during such time as the mortgage is insured." 24 C.F.R. § 203.16a(a)(2). The HUD requirement is for flood insurance in "an amount *at least* equal to either the outstanding balance of the mortgage . . . or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." 24 C.F.R. § 203.16a(c) (emphasis added). The words "at least" are consistent with interpreting Covenant 4 to allow the lender to require more insurance than HUD requires, and inconsistent with interpreting the covenant to prohibit more.

16

Second, the context.   The statutory and regulatory context of FHA guarantees for home-mortgage loans makes it implausible to read Covenant 4 as imposing a ceiling on the amount of flood insurance a lender may require.  The FHA's mortgage-guarantee scheme makes the lender's need for more flood insurance than the unpaid principal balance acute, because the FHA places the risk of flood losses on the lender.  If a borrower defaults on an FHA-guaranteed mortgage, the lender conveys the mortgage or property title to the federal government and collects on the guarantee to cover losses on the mortgage.  12 U.S.C. § 1710.  If, however, a flood damages the property, the lender cannot collect from the United States until it has repaired the damage or deducted the cost of repairing the damage from the insurance benefits.  24 C.F.R. § 203.379.  If the insurance amount is limited to the unpaid principal balance, as opposed to the property's replacement value, the lender would not be able to insure against the risk the regulatory scheme imposes because the cost of repairing the damage may exceed the unpaid balance of the loan, which would result in the lender having to pay more for repair than it could collect in insurance benefits.

The lender's need for more insurance than the federally required minimum is underscored by another feature of how the federal flood-insurance regulatory scheme intersects the FHA mortgage-insurance program.  For homes outside areas designated as presenting special flood hazards, HUD does not require the borrower

17

to have any flood insurance at all.  Adopting Feaz's interpretation of Covenant 4's third sentence would forbid the lender from requiring the borrower to obtain more flood insurance than HUD requires.  That means that in any area outside the special-flood-hazard designation, the lender could not require the borrower to obtain any flood insurance at all.  Yet homes in such areas may face significant flood risk.  As the First Circuit recently observed in *Kolbe*:

> There would be no reason to forbid the lender from requiring any flood insurance on such homes, yet allow the lender to require as much insurance as it wishes for other hazards that are extremely unlikely to occur, such as earthquakes or tornados in certain parts of the country. Such an irrational policy objective could not plausibly be attributed to HUD, and the United States' brief confirms that HUD did not intend such a result.

2013 WL 5394192, at *12

Feaz's interpretation would also prevent lenders from requiring adequate flood insurance for homes with mortgages above $250,000.  *See id.*  It would prevent lenders from following the FEMA-recommended practice of adopting a "sound flood insurance risk management approach" by following the "insurance industry practice of insuring buildings to full" replacement cost value,[5] precisely what Wells Fargo did in this case.[6]

---

[5] FEMA, National Flood Insurance Program, Mandatory Purchase of Flood Insurance Guidelines, 27-28 (Sept. 2007).

[6] *See McKenzie*, 2012 WL, 5372120, at *15; *Wulf*, 798 F. Supp. 2d at 589.  In *McKenzie*, the court observed that by insuring buildings to full replacement cost value, the borrower and the

18

As in *Kolbe*, the United States argues in its amicus brief that interpreting Covenant 4 to prevent a lender from requiring more flood insurance than the federally required minimum would impair federal housing policy.  Lenders unable to require adequate flood insurance would predictably be reluctant to offer FHA-insured mortgages in areas presenting any significant flood risk, or would pass on their increased risk of loss in the form of higher interest rates.  Either approach is inconsistent with the FHA's purpose of encouraging affordable home ownership and with the NFIP's purpose of encouraging adequate flood insurance.  *See* 42 U.S.C. §§ 4001(a), 4002(b) (describing congressional findings as to NFIA's goals and purposes).

The United States asserts that it consistently interprets the uniform language HUD drafted to implement the FHA mortgage-insurance program and the federal flood-insurance program.  Its interpretation allows lenders to require more flood insurance than HUD requires.  As the *Kolbe* en banc opinion explained, if there were doubts as to Covenant 4's meaning, we would resolve those doubts by deference to this interpretation.  "Indeed, multiple courts of appeals have accorded deference to agency interpretations of contract terms that were promulgated and

---

lender are both better protected and it is not reasonable to interpret the mortgage as precluding a lender's ability to follow FEMA's recommendations.  In *Wulf*, the court noted that it "seemed incongruous that a lender would not be able to follow . . . FEMA's recommendation in connection with an FHA loan."

19

mandated by a federal regulation." *Kolbe*, 2013 WL 5394192, at *16 (citing *Saavedra*, 700 F.2d at 499; *Honeywell*, 228 Ct. Cl. at 594). But, as the *Kolbe* panel noted, we do not have to identify the precise level of deference due to decide this appeal.

Feaz's policy argument for reading Covenant 4 to prevent mortgage lenders from requiring borrowers to obtain more flood insurance than federal law requires fails to recognize the purpose and interaction of the housing and flood-insurance regulations. Feaz agrees that the federal policy behind HUD and the FHA is to promote affordable home ownership. She asserts, as did the borrowers in *Kolbe* and similar cases, that allowing the lender to require flood insurance adequate to cover the home's replacement cost violates that policy because the result is to increase the overall cost of home ownership for FHA borrowers. But it does not follow that any increase to the cost offends the policy of promoting affordable home ownership, or that every step to reduce the cost furthers the policy. To the contrary, if lenders refuse to offer FHA-insured loans for the large areas of the country that face some — but not extreme — flood risk, or for homes with mortgages over $250,000, or if lenders pass on their increased flood-loss risk exposure to consumers by charging greater interest for such loans, that reduces rather than promotes affordable home ownership.

20

Feaz's other arguments are no more persuasive. She asserts that "any hazard" in the title of Covenant 4 — "Fire, Flood and Other Hazard Insurance" — and in the first sentence — "Borrower shall insure . . . against any hazards . . . including fire" — cannot include floods because of the insurance-industry practice of issuing homeowners' policies that exclude floods. The fact that industry practice has evolved to exclude flood insurance from standard hazard insurance policies explains why HUD documents separately list "flood insurance" and "hazard insurance." But this fact does not mean that floods are not hazards. To the contrary, industry practice and HUD and NFIA regulations confirm the common-sense understanding, reflected in Covenant 4, that while all hazards are not floods, all floods are hazards.

Feaz's argument that allowing Wells Fargo to demand more flood insurance than federal law requires will give it unfettered ability to impose unreasonable charges has no support in this record. Wells Fargo required coverage only for the replacement value of Feaz's home, which is a properly insurable interest consistent with good lending practices.

We also find unpersuasive Feaz's argument that Covenant 4 must be ambiguous because courts have divided over whether it is ambiguous. This argument proves too much. First, it ignores the variation in the pleadings and arguments presented in the different cases around the country. For example, a case

21

Feaz cites, *Wulf*, 798 F. Supp. 2d at 589, denied the mortgage company's motion to dismiss, but did so because many of the arguments for dismissal had not been presented.[7]  Second, this argument would make controlling the opinion of the first court that decides whether a contract provision is ambiguous.  And third, the argument ignores the possibility that a court can be wrong, including in contract-interpretation decisions.

The District Court properly analyzed the motion to dismiss, taking as true the allegations (which are undisputed) that Wells Fargo force-placed flood insurance for the replacement value of Feaz's home, more than the minimum HUD requires, after Feaz failed to respond to the notices requiring her to obtain the coverage and provide proof she had done so.  The District Court found the contract unambiguous and concluded that Feaz's complaint failed to state a claim for breach of contract.  We affirm.

### B.      The Claims for Breach of Extracontractual Duties

Under Alabama law, every contract imposes an implied duty of good faith and fair dealing.  Feaz asserted four grounds for alleging that Wells Fargo breached this duty.  These claims fail as a matter of law.  The District Court

---

[7] For example, the district court stated that the "Court was informed at oral argument that the language at issue is from an FHA form that is required for all FHA loans.  The Court was also told that FEMA recommends that lenders require full replacement value when lending in a flood plain area. . . . . [N]one of this was briefed by the parties and the Court is reluctant to make any conclusive decision on this point."  So, the district court had not even been made aware that the language was a uniform covenant.

correctly dismissed Feaz's claim that Wells Fargo breached the duty of good faith and fair dealing by demanding more flood insurance than federal law or the contract required, misrepresenting the required amount of flood insurance, and imposing contract requirements that did not exist or exceeded the disclosed requirements. These claims fail because the mortgage contract unambiguously contemplated Wells Fargo's actions. The District Court also correctly dismissed the claim that Wells Fargo exercised bad faith in requiring a higher amount of flood insurance and force placing it when the insured failed to comply. As we previously noted, Wells Fargo has an interest in insuring the home up to its replacement value. A bank does not act in bad faith when acting to protect its legitimate interests through contractually authorized actions. The extracontractual-duties claims fail for the same reasons that, as a matter of law, Wells Fargo did not breach the contract by requiring Feaz to obtain flood insurance up to the home's replacement value.

The District Court correctly noted that requiring insurance up to the property's full replacement cost is consistent with FEMA guidelines, as well as guidance from the Comptroller of the Currency and the Federal Deposit Insurance Corporation. *Feaz*, 2012 WL 6680301, at *9. It would be anomalous to find that following good practices could violate an implied duty of good faith and fair

23

dealing.  Moreover, the notice that Feaz received gave her ample opportunity to avoid the higher-cost force-placed insurance and warned her about the cost.

The claim for breach of fiduciary duty fails as well.  Under Alabama law, a mortgage lender does not owe the borrower a general fiduciary duty.  *See Selman v. CitiMortgage, Inc.*, 12-cv-441(WS-B), 2013 WL 838193, at \*10 (S.D. Ala. March 5, 2013); *Atkins v. GE Capital Mortg. Servs. Inc.*, 993 F. Supp. 1406, 1419 (M.D. Ala. 1998); *K&C Dev. Corp. v. AmSouthBank, N.A.*, 597 So.2d 671, 675 (Ala. 1992); *see also Telfair v. First Mortg. Corp.*, 216 F.3d 1333 (11th Cir. 2000) (construing Georgia law); *Gurley v. Bank of Huntsville*, 349 So.2d 43, 45 (Ala. 1977) (concluding that an escrow agent's obligations and duties are generally limited to those delineated in the escrow agreement).  Feaz alleges that the deficiency notification Wells Fargo sent was deceptive and fraudulent because neither federal law nor the mortgage-loan contract required her to have such flood insurance; this allegation fails as a matter of law for the same reasons the breach of contract claim fails.  Feaz alleges that Wells Fargo's use of escrow funds to pay for the force-placed insurance breached fiduciary duties, but this assumes, without a legal basis, that a lender's administration of such "escrow funds" creates a fiduciary relationship.  *See Telfair*, 216 F.3d at 1341.  The allegations that Wells Fargo violated its fiduciary duty and committed fraud by charging Feaz a commission, a "kickback," or "other compensation" — any amount above the net

24

cost to Wells Fargo of obtaining the force-placed flood insurance — also fails for the same reasons and because Wells Fargo disclosed that Feaz would incur higher costs if it force-placed the insurance for her.  We agree with the Seventh Circuit that "simply calling a commission a kickback doesn't make it one.  The defining characteristic of a kickback is divided loyalties.  But [the lender] was not acting on behalf of [the borrower] or representing her interests.  The loan agreement makes it clear that the insurance requirement is for *the lender's* protection."  *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013).

The District Court properly dismissed the extracontractual claims.

## V.    Conclusion

The District Court's decision dismissing the complaint for failing to state a claim is **Affirmed**.

25