Madelaine **MARTORELLA,** Tracey Lawrence Graham, and Dorothy Wright, as personal representative of the Estate of Arnold Robinson, Plaintiffs,

v.

**DEUTSCHE BANK NATIONAL TRUST COMPANY, as Indenture Trustee for American Home Mortgage Investment Trust 2006–1, and American Home Mortgage Servicing, Inc., Defendants.**

Case No. 12–80372–CIV–MARRA/BRANNON

United States District Court, S.D. Florida.

Signed August 5, 2015

Entered August 6, 2015

Adam M. Stewart, Michelle H. Blauner, Edward F. Haber, Shapiro Haber & Umy, LLP, Boston, MA, James A. Bonfiglio, James A. Bonfiglio, P.A., Boynton Beach, FL, Jay Douglas Dean, Robert J. Axelrod, Axelrod & Dean LLP, New York, NY, Jeffrey M. Liggio, Liggio Benrubi, Louis M. Silber, Silber & Davis, West Palm Beach, FL, for Plaintiffs.

Abigail M. Lyle, Corey Anthony Lee, Hunton & Williams, Miami, FL, Brian V. Otero, Ryan A. Becker, Stephen R. Black-locks, Hunton & Williams, LLP, New York, NY, for Defendants.

### ORDER DENYING MOTION FOR SUMMARY JUDGMENT

KENNETH A. MARRA, United States District Judge

**THIS CAUSE** is before the Court upon Defendants' Motion for Summary Judgment [DE 256]. The motion is fully briefed and ripe for review. The Court has carefully considered all relevant filings and heard oral argument on May 13, 2015.

## Introduction

Plaintiffs Madelaine Martorella ("Martorella"), Tracey Lawrence Graham ("Graham"), and Dorothy Wright ("Wright"), as personal representative of the Estate of Arnold Robinson [1] (collectively "Plaintiffs") bring this action against Defendant Homeward Residential, Inc. ("Homeward"), f/k/a American Home Mortgage Servicing, Inc., arising out of Homeward's participation in an alleged scheme to force-place insurance coverage at grossly excessive and unreasonable prices on properties owned by Plaintiffs and other Florida homeowners.[2] Plaintiffs allege that Homeward violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), breached the covenant of good faith and fair dealing implied in their mortgages, and was unjustly enriched by force-placing "excessively priced insurance policies that provide less comprehensive coverage, while keeping a portion of those excessive premiums as commissions or other remuneration." *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F.Supp.2d 1218, 1223 (S.D.Fla. 2013) (Marra, J.).

This proposed class action was initially filed by Martorella in state court. After removal, Defendants moved to dismiss Martorella's claims. Defendants' first motion to dismiss was denied. *Id.* About a year later, Martorella sought leave to amend her complaint to add Graham and Wright as plaintiffs in view of Defendants' attempts to eliminate her as class representative by way of refunds to her escrow account long after initiation of the suit. *See* DE nos. 128, 132, 153, 177. The Motion to Amend was granted. DE 208.

On September 24, 2014, Plaintiffs filed their Amended Class Action Complaint ("Complaint" or "Compl."), which added Graham and Wright as named plaintiffs. DE 209. Defendants then moved to dismiss the claims of Graham and Wright (Counts I, V and XI), which motion was denied. Now the Court addresses Defendants' Motion for Summary Judgment, which has multiple overlapping issues that were already raised in the motions to dismiss.

## STANDARD OF REVIEW

■ Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Baby Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1314 (11th Cir.2010). A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir.2004) (citing *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505).

■ In ruling on a motion for summary judgment, the Court views all evi-

---

1. Wright is the personal representative of the Estate of Mr. Arnold, who was the mortgagor on the loan. References to Wright herein, include Mr. Arnold.

2. Martorella also has asserted claims against Defendant Deutsche Bank National Trust Company ("Deutsche Bank"). Graham and Wright have not. Homeward and Deutsche Bank are referred to collectively herein as "Defendants."

dence and draws all reasonable inferences in favor of the non-moving party. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Tana v. Dantanna's,* 611 F.3d 767, 772 (11th Cir.2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *St. Charles Foods, Inc. v. America's Favorite Chicken Co.,* 198 F.3d 815, 819 (11th Cir.1999) (quoting *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296–97 (11th Cir.1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1315 (11th Cir.2007).

### UNDISPUTED FACTS

1. Lender placed insurance ("LPI") was purchased for Plaintiffs under master policies between Homeward and surplus-line insurance underwriters Empire and QBE Specialty. Stewart Exs. 44–45.

2. In July 2008, Homeward entered into a contract with ZC Sterling Insurance Agency, Inc. ("ZCS"), now known as QBE First Insurance Agency, Inc. ("QBE"), for QBE to serve as its exclusive LPI vendor. Compl. ¶ 48.

3. QBE was the managing general agency and developed and operated the LPI program for its affiliated underwriters. Stewart Exs. 80–82; Stewart Ex. 37 at 230:22–231:11.

4. Homeward knew that QBE's LPI carriers in Florida were surplus lines carriers. Stewart Ex. 9 at 41:16–42:22, 173:1–174:15, 193:1–20; Stewart Ex. 37 at 234:19–235:12; Miller Report at 21–22, 25, 29–33.

5. The rates utilized by ZCS/QBE (Stewart Exs. 63 and 83) for Homeward's LPI program in Florida were not filed with or approved by the Florida Office of Insurance Regulation ("FLOIR"). Stewart Ex. 9 at 41:16–42:22, 173:1–174:15; Stewart Ex. 37 at 137:19–22, 235:3–15; Stewart Ex. 84 (Defendants' expert conceded that surplus lines insurers were used in Florida and were not required to file and justify their rates).

6. In correspondence entitled "HAZARD INSURANCE LENDER PLACED POLICY COVER LETTER", Homeward wrote Plaintiffs: "At your expense, we purchased lender placed hazard insurance to protect our interest in the property. The premium cost for purchasing this insurance is shown on the attached policy declaration. You are solely responsible for the repayment of this cost." Kunkleman Ex. H; Otero Exs. H, L. The "Additional Named Insured Certificate," enclosed in the letter, lists Homeward and the Plaintiffs as the "Named Insureds," along with the "Premium" for the coverage. *Id.*; Pls. SOF ¶ 55. Homeward then charged Plaintiffs' escrow accounts for the LPI charges. *See, e.g.,* Pls. SOF ¶¶ 114, 124, 138, Pls. Resp. to Defs. SOF ¶¶ 24, 32.

7. This certificate also stated, "THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW." DE 253–2 at 83 of 87.

8. The letter also states, "[p]lease note that your security instrument (mort-

gage or deed of trust) gives American Home Mortgage Servicing, Inc. *the contractual* right to collect such interest and establish an escrow account." DE 253–2 at 80 of 87 (emphasis added).

9. At the bottom of the letter it states, "AMERICAN HOME MORTGAGE SERVICING, INC., IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT." *Id.*

10. The escrow history shows that, over the life of Ms. Martorella's loan, her escrow account was charged $33,553.98 for LPI. There were five LPI charges to Ms. Martorella's escrow account: (a) $4,771 on February 22, 2006; (b) $5,166.99 on October 16, 2006; (c) $7,632.57 on November 18, 2008; (d) $7,991.71 on September 13, 2011; and (e) $7,991.71 on July 9, 2012. Stewart Ex. 8.

11. The escrow history shows that, over the life of the loan, Ms. Martorella's escrow account has been refunded $29,149.98 for LPI. There were six LPI credits to Ms. Martorella's escrow account: (a) $367 on March 28, 2007; (b) $5,166.99 on March 28, 2007; (c) $6,563.14 on August 25, 2009; (d) $1,069.43 on March 7, 2011; (e) $7,991.71 on February 28, 2013; and (f) $7,991.71 on February 28, 2013. Stewart Ex. 8.

12. There is a net charge of $4,404 for LPI carried on the balance of the escrow account to this date. Stewart Ex. 8; Stewart Ex. 15 at 76–78, 89–92.

13. Ms. Martorella went into default following the increase in her monthly loan payment. Stewart Ex. 16 at 005243–44.

14. The April 16, 2009 default notice says that Ms. Martorella owed two monthly payments totaling $5,527.82, plus late charges and fees. The default notice was sent by Homeward as debt collector. Stewart Ex. 16 at 004846, 004848, 005243–44; Stewart Ex. 15 at 109–10.

15. On June 4, 2009, Deutsche Bank sued to foreclose. Stewart Ex. 17. Under Ms. Martorella's form mortgage, the LPI charges become "additional debt of Borrower," Otero Ex. A at ¶ 9, and as part of the foreclosure proceeding, Defendants aver that the "escrow shortage" is "now due [and] owing." Stewart Ex. 17 at ¶ 12. Defendants also seek a "deficiency judgment" if the "proceeds of the sale are insufficient to pay Plaintiff's claim." Stewart Ex. 17 at Prayer G.

16. Ms. Martorella's foreclosure remains pending. Stewart Ex. 3 at 57; Stewart Ex. 2 at 46–47.

## DISCUSSION

### *Florida Deceptive and Unfair Trade Practices Act*

The FDUTPA is designed to protect consumers from "unconscionable, deceptive, or unfair acts or practices" in trade and commerce, and must be "construed liberally" to promote that policy. Fla. Stat. § 501.202 and (2). The FDUTPA declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "[T]here are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Martorella v. Deutsche Bank Nat'l. Trust Co.*, 931 F.Supp.2d 1218 (S.D.Fla.2013) (citations omitted).

Defendants argue that Plaintiffs cannot maintain their FDUTPA claim because (i) the statute's "insurance" exemption applies, (ii) Homeward's actions do not constitute "trade or commerce"; (iii) Plaintiffs cannot prove causation under FDUTPA; (iv) Homeward's practices were not "unfair" or "deceptive"; and (v) Plaintiffs should not be allowed to pursue injunctive relief under FDUTPA. The Court addresses each contention in turn.

### 1. The "Insurance" Exemption to FDUTPA Claims

■ Defendants argue that the statutory exemption set out in Florida Statute Section 501.212(4)(a) precludes Plaintiffs from pursuing a claim for violations of the FDUTPA. The Court rejects this contention. Addressing the same argument, the Eleventh Circuit has stated:

> The express language of Fla Stat. § 501.212(4)(a) creates a specific exemption from suit under FDUTPA for "[a]ny person or activity regulated under laws administered by ... [t]he Office of Insurance Regulation of the Financial Services Commission." Florida courts resolve questions about the applicability of this provision by looking to the activity which is the subject of the lawsuit, and whether that activity is subject to the regulatory authority of the Office of In-

surance Regulation. *See W.S. Badcock Corp. v. Myers,* 696 So.2d 776, 782–83 (Fla.Dist.Ct.App.1996). Because the conduct of which State Farm complains in this lawsuit [3] is not a type regulated by the Office of Insurance Regulation, the exemption of Fla. Stat. § 501.212(4)(a) does not apply.

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.,* 427 Fed. Appx. 714, 723 (11th Cir.2011), *rev'd in part on other grounds by State Farm Mut. Auto Ins. Co. v. Williams,* 563 Fed.Appx. 665, 671 (11th Cir.2014).

Defendants do not argue that Homeward was a person regulated by the FLOIR. Relying exclusively on its motion to dismiss briefing, Defendants fail to meet their burden of establishing, as a matter of law, that the activity at issue in this case, the alleged charging of excessive and unreasonable amounts for LPI in exchange for commissions and other remuneration, was regulated by the FLOIR.

Here, Homeward procured LPI through two surplus lines carriers [4] affiliated with QBE. Pls. SOF ¶¶ 78, 88. Homeward and QBE have admitted that the rates for the LPI at issue were not filed with or approved by the FLOIR. Pls. SOF ¶ 89. Defendants' expert agrees, stating that he "understand[s] that both insurers of the LPI coverage at issue in this case were

---

**3.** State Farm alleged that Defendants unlawfully obtained personal injury protection benefits from State Farm by "push[ing] State Farm's insureds through a sham course of treatment and evaluation designed specifically to exhaust the patients' insurance benefits." *Physicians Injury Care Ctr., Inc.,* 427 Fed. Appx. at 717.

**4.** State regulation of insurance begins with licensure of insurance companies. There are, however, some exceptions for "surplus lines" of insurance that do not require state licen-

sure. *See* 2 Julie Mix McPeak, Licensing of Insurers, in New Appleman on Insurance Law Library Edition, § 9.09. "Some placement of insurance coverage by companies lacking a certificate of authority in the state is not only allowable under state insurance codes, but encouraged as a necessary market mechanism. Surplus lines insurance is property and casualty coverage that is underwritten by a nonadmitted insurer for nonstandard risks or policy levels that are unavailable in the commercial market." *Id.*

surplus-lines insurers in Florida during the class period" and is "aware that surplus-lines insurers are not required to file and justify their rates with the Florida OIR." Pls. SOF ¶ 89. Because Homeward is not an insurance company regulated by FLOIR and because the LPI rates were not subject to regulation by the FLOIR, the activity at issue in this case was not regulated by the FLOIR, and Homeward has not established, as a matter of law, that the insurance exemption applies.[5]

In their Motion to Dismiss, Defendants relied on *W.S. Badcock Corp. v. Myers,* 696 So.2d 776, 782–83 (Fla.Dist.Ct.App. 1996) for the proposition that Plaintiffs' FDUTPA claim is barred because the statute does not apply to insurance. The Court declined to address this argument at the motion to dismiss stage, as this argument requires resort to a factual analysis beyond that presented by the Complaint and the Court is prohibited from engaging in such an analysis at the motion to dismiss stage. In that case, defendant Badcock was a seller of consumer goods and offered financing to consumers under its "Easy Purchase Plan Credit Agreement." That agreement required consumers to pay a $7 fee which Badcock represented was for the purchase of "nonfiling insurance"—protection for Badcock against losses resulting from its failure to file to perfect its security interest in the financed goods. Badcock entered into an agreement with American Bankers Insurance Co. under which Badcock gave American Bankers the $7 fees (styled as "premiums") and American Bankers agreed to cover losses to Badcock up to 90% of the total fees/premiums it received from Badcock.

The plaintiff claimed the $7 fee violated FDUTPA. Badcock responded that the fee was for insurance and that the plaintiffs' claim thus fell within the insurance bar. The trial court disagreed. The *Badcock* Court held that "[t]o resolve the question" of whether plaintiff's FDUTPA claim was barred, "we must determine whether the service provided to Badcock by American Bankers Insurance Company constituted insurance, subject to the regulatory authority of the Department of Insurance." 696 So.2d at 782. The court thus looked to the nature of the transaction between Badcock and American Bankers: if that transaction was for the provision of insurance, then Badcock could not be liable under FDUTPA.

To determine whether the transaction was for the provision of insurance, the District Court of Appeals looked to the five elements described in *Professional Lens Plan, Inc. v. Dep't of Ins.,* 387 So.2d 548, 550 (Fla.Dist.Ct.App.1980) that are normally present in an insurance contract: (1) an insurable interest; (2) a risk of loss; (3) an assumption of the risk by the insurer;

---

**5.** Florida Stat. § 627.410(1) requires an insurer to gain the Office's approval of a "basic insurance policy" before an insurer may sell a policy. Section 626.913(4), excuses a surplus line policy from Chapter 627, including the approval requirement in Section 627.410. *Lemy v. Direct Gen. Fin. Co.,* 885 F.Supp.2d 1265, 1271 (M.D.Fla.2012) *aff'd,* 559 Fed. Appx. 796 (11th Cir.2014). The Florida Surplus Lines Service Office is a "self-regulating organization," Fla. Stat. § 626.921(1), and surplus lines carriers are exempt from the requirement to file and gain approval of their rates from the FLOIR. Fla. Stat. § 626.913(4) ("Except as may be specifically stated to apply to surplus lines insurers, the provisions of chapter 627 do not apply to surplus lines insurance authorized under §§ 626.913–626.937, the Surplus Lines Law"); Fla. Stat. § 627.021(2)(d) (excluding surplus lines insurance from the ratings laws of part I, chapter 627, F.S.).

(4) a general scheme to distribute the loss among the larger group of persons bearing similar risks; and (5) the payment of a premium for the assumption of risk. The court held that Badcock did not have an insurable interest because it had an automatically perfected security interest in the goods it sold to consumers; that American Bankers faced no risk of loss because its liability to Badcock was limited to 90% of the fees it received from Badcock; and there was no scheme to distribute a loss among a wider group of retailers with similar risks. 696 So.2d at 782–83. The court therefore concluded that Badcock's agreement with American Bankers was not for insurance, and so affirmed the trial court's award of summary judgment against Badcock. *Id.* at 783–84.

Contrary to Defendants' characterization of this case, the findings in *Babcock* and *Professional Lens* do not lead to the determination that Plaintiffs' FDUTPA claim is barred. This case relates to Homeward charging borrowers amounts for LPI that were allegedly unreasonable, excessive, and unrelated to the provision of LPI. As in *Badcock*, Homeward "imposed an additional charge on its ... customers under the guise of collecting an insurance premium," *Badcock*, 696 So.2d at 783, but a large percentage of that "premium" was designated not for the insurance, but for commissions and other compensation that QBE and Homeward allegedly pocketed. This is exactly the type of arrangement that the *Badcock* Court identified as outside the FDUTPA insurance exemption. *Badcock*, 696 So.2d at 783 ("no evidence was presented that the fee or premium charged was based on an analysis of Badcock's potential losses based on past experience.").

Additional support is found in the case of *Montoya v. PNC Bank, N.A.*, 94 F.Supp.3d 1293 (S.D.Fla.2015). In *Montoya*, the plaintiff alleged that the insurer for lender—placed insurance gave plaintiff's mortgage holder kickbacks in order to gain the exclusive right to force its insurance on plaintiff's property. 94 F.Supp.3d at 1307–08. The *Montoya* Court found that the allegations were not directly related to the ordinary "business of insurance" (as it applies to the McCarran–Ferguson Act) because they (1) do not have the effect of transferring or spreading a policyholder's risk; (2) are not an integral part of the policy relationship between the insurer and insured; and (3) are not limited to entities within the insurance industry. *Montoya v. PNC Bank, N.A.*, 94 F.Supp.3d 1293, 1315 (S.D.Fla.2015) citing *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211–21, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("legislative history of the McCarran–Ferguson Act strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk," 440 U.S. at 220–221, 99 S.Ct. 1067).

## 2. *"Trade or Commerce"*

■ The FDUTPA declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any *trade or commerce*." Fla. Stat. § 501.204(1) (emphasis supplied). FDUTPA defines "trade or commerce" as the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).

Defendants argue that Plaintiffs cannot pass "the threshold trade or commerce"

test because insurance was not being provided to Plaintiffs, but to the lender, and Plaintiffs did not pay the premium, but rather Homeward purchased the coverage and sought reimbursement for the premium amount from Plaintiffs. "Plaintiffs were therefore not buying insurance, and Homeward's act of seeking reimbursement for coverage it had purchased to protect the lender is not an act taken in the course of 'trade or commerce' as that term is understood in FDUTPA." DE 256 at 16 of 26.

For this proposition, Homeward merely cites two cases in a single paragraph, and provides parentheticals, but elaborates no further.[6] Both cases find that a law firm's pursuit of legal remedies against an individual does not constitute trade or commerce. According to Defendants' parenthetical, summary judgment was granted in *Kelly v. Palmer, Reifler, & Associates, P.A.*, 681 F.Supp.2d 1356 (S.D.Fla.2010) ("*Kelly*") on the FDUTPA claim because no "connection or nexus to trade or commerce between these parties" existed when defendant was pursuing enforcement of contract rights.

In *Kelly*, individuals who received civil theft demand letters from a law firm, threatening to file a lawsuit if payments were not made, filed a class action suit alleging, among other claims, violation of FDUTPA by that law firm. Plaintiffs maintained that their dealings with the Palmer Law Firm constituted "trade or commerce" because, through the demand letters, the firm solicited and offered them a release, a "thing of value," in exchange for money. The district court granted summary judgment for the law firm on the FDUTPA violation claims, stating,

we do not agree with Plaintiffs that the Palmer Law Firm's pursuit of civil theft remedies … falls within the meaning of "trade or commerce" such that the firm could be subject to liability under FDUTPA. While it has some initial appeal, we do not find that the firm's offer to settle and release claims for money constitutes soliciting and offering to Plaintiffs a "thing of value" under the act … The Palmer Law Firm's acts—conduct ostensibly occurring during the exercise of a legal remedy—had zero connection whatsoever to any "trade or commerce."

*Id.* at 1375. Homeward relies on this case for the proposition that when it sought reimbursement for the cost of insurance coverage it purchased to protect the lender, that act was not taken in the course of "trade or commerce" as that term is understood in FDUTPA.

The other case cited by Defendants is *Florida v. Shapiro & Fishman, LLP*, 59 So.3d 353 (Fla.Dist.Ct.App.2011), where the court held that the alleged conduct of the law firm did not fall within the rubric of "trade or commerce" because the Office of the Attorney General's civil investigative subpoena centered on the law firm's conduct in the processing of foreclosure cases, "as opposed to the initial applications for mortgages or the initial lending relationships, which would be more akin to traditional notions of 'trade or commerce' as defined by the FDUTPA statute." *Id.* at 356. Homeward relies on this case for the proposition that there is no "trade or commerce" when a defendant does not provide a service to a consumer, as Homeward was not providing to Plaintiffs (but rather to the lender). The Court rejects Homeward's reliance upon these cases be-

---

6. DE 256 at 11.

cause they have no application to the facts at issue here.

First, Homeward had a direct financial relationship with Plaintiffs. In correspondence entitled "HAZARD INSURANCE LENDER PLACED POLICY COVER LETTER," Homeward wrote Plaintiffs: "At your expense, we purchased lender placed hazard insurance to protect our interest in the property. The premium cost for purchasing this insurance is shown on the attached policy declaration. You are solely responsible for the repayment of this cost." Kunkleman Ex. H; Otero Exs. H, L. The "Additional Named Insured Certificate," enclosed in the letter, lists Homeward and the Plaintiffs as the "Named Insureds," along with the "Premium" for the coverage. *Id.*; Pls. SOF $ 55. Homeward then charged Plaintiffs' escrow accounts for the LPI charges. *See, e.g.,* Pls. SOF $$ 114, 124, 138, Pls. Resp. to Defs. SOF $$ 24, 32.

Moreover, there is no support for Homeward's narrow interpretation of trade or commerce by arguing that it did not engage in trade or commerce because it purchased LPI for the lender's benefit. *See Williams v. Edelman,* 408 F.Supp.2d 1261, 1274 (S.D.Fla.2005) ("Conspicuously lacking from the provision granting individuals a cause of action [for FDUTPA] is any requirement that the individual must have suffered the violation at the hands of a party who has provided goods or services to that individual. Nor is such a requirement implicit in the broad definitions of 'consumer' or 'trade or commerce' ...").

It is worth noting that one of the stated purposes of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). To effectuate this goal, courts have been instructed to liberally construe the provisions of the statute. *See* Fla. Stat. § 501.202 ("The provisions of this part shall be construed liberally to promote the following policies: ..."); *Alhassid v. Bank of Am., N.A.,* 60 F.Supp.3d 1302 (S.D.Fla.2014) (seeking to collect fees outside the scope of its legal entitlement, and billing Plaintiffs for specific services which were unauthorized fall within the scope of "trade and commerce" under FDUTPA); *Schauer v. Gen. Motors Acceptance Corp.,* 819 So.2d 809, 812 (Fla.Dist.Ct.App.2002) (Defendant's alleged actions of willfully harassing Plaintiff and his family with respect to the collection of its debt fell within FDUTPA's broad definition of "trade or commerce"); *Losure v. Capital One Servs., Inc.,* 2006 WL 166520, *3 (M.D.Fla. Jan. 23, 2006). Accordingly, as the Court found earlier when ruling on the motion to dismiss, the Court finds again: the transactions at issue fall comfortably within the definition of trade or commerce because Defendants "provided, offered, or distributed" LPI. *Martorella,* 931 F.Supp.2d at 1224.

Furthermore, there are genuine disputes of material fact regarding whether Homeward charged Plaintiffs and other borrowers excessive and unreasonable amounts for the LPI it placed on their property, which contained charges unrelated to the provision of the LPI, and thereby breached borrowers' form mortgage contracts and/or was unjustly enriched. If proven at trial, this would place Homeward's conduct squarely within "trade or commerce" under FDUTPA.

### 3. *Causation under FDUTPA*

Defendants next argue that Plaintiffs cannot establish causation under

FDUTPA. Specifically, Defendants argue that Plaintiffs cannot establish that the supposedly excessive amounts they were charged for LPI were the result of Homeward accepting unearned commissions, below-cost services, and other remuneration because the LPI premiums were calculated according to a rate schedule set in 2006, before Homeward existed, and two years before the allegedly deceptive and unfair kickbacks. This argument is unpersuasive.

Causation may be found when Homeward chose to purchase the allegedly excessively-priced LPI from QBE and charged Plaintiffs and other Florida borrowers for it. As this Court explained when denying Homeward's earlier motion to dismiss, the claims are that Homeward "violated the FDUTPA by purchasing excessively priced insurance policies that provide less comprehensive coverage, while keeping a portion of those excessive premiums as commissions or other remuneration." *Martorella*, 931 F.Supp.2d at 1223. Plaintiffs need not prove that the commissions and other benefits caused the LPI to be excessive, as Defendants suggest. The record evidence that Homeward purchased excessively-priced LPI and kept a portion of those excessive premiums as commissions and other remuneration, establishes the necessary causal link under FDUTPA. The record demonstrates the necessary causation because the harm Plaintiffs suffered (excessive and unreasonable LPI amounts charged to their accounts) was a foreseeable result of Homeward's conduct. *Martorella*, 931 F.Supp.2d at 1224–2530 (citing *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and S'holder Deriv. Litig.*, 690 F.Supp.2d 1296, 1314 (S.D.Fla.2010)), *rev'd on other grounds*, 760 F.3d 1185 (11th Cir.2014) (quoting *Zivojinovich v. Barner*, 525 F.3d 1059, 1069 (11th Cir.2008)) ("[i]f a reasonably prudent person could foresee that a harm like the one that the plaintiff suffered might result from his or her actions, then there is proximate causation.")

### 4. *Homeward's Practices*

■ Relying upon *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1111 (11th Cir.2014), Defendants argue that because neither Defendant owed a duty of loyalty to the borrower on whose property the insurance was being placed, commissions or other benefits from an insurer to a lender or servicer were not unfair or deceptive "kickbacks." This argument was previously asserted in Defendants' Motion to Dismiss the Claims of Plaintiffs Graham and Wright and was rejected. The Court refers the parties to the Order ruling on that motion, section C., Duty of Loyalty. *See also, Hamilton v. Suntrust Mortgage Inc.*, 6 F.Supp.3d 1300, 1311 (S.D.Fla. 2014).

Since briefing on the Motion to Dismiss, more decisions have been issued and "nationwide, courts with cases stemming from lender-placed insurance are coming to different conclusions regarding the issues before them." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 693–94 (S.D.Fla.2014), appeal dismissed (Oct. 15, 2014). Most notably, in *Circeo–Loudon v. Green Tree Servicing, LLC*, No. 14–21384–CIV–MORENO, 2014 WL 4219587, at *2 (S.D.Fla. Aug. 25, 2014), Judge Moreno, relying on *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 604 (7th Cir.2013) and *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir.2014), found the claims against the defendant insurance company to be barred by disclosures Plaintiffs had received in the loan agreement which made it clear that force placed insurance was for

the lender's protection and that the lender was not acting on behalf of the borrower or representing her interests.

While it was Plaintiffs' responsibility to maintain hazard insurance on their property at all times and if they failed to do so, their lender had the right to secure the insurance and pass the cost on to them; and while the lender fully disclosed that lender-placed insurance may be significantly more expensive than Plaintiffs' own policy and may include a fee or other compensation to the bank and its servicer, this Court finds that these facts alone do not mandate dismissal or summary judgment because, as this Court previously explained, the claims are that Homeward "violated the FDUTPA by purchasing excessively-priced insurance policies that provide less comprehensive coverage, while keeping a portion of those excessive premiums as commissions or other remuneration." *Martorella*, 931 F.Supp.2d at 1223. This Court went on to hold that such allegations "support[ ] Plaintiff's claim under the unfairness prong of the FDUTPA." *Id.* at 1224. As Judge Tigar in the Northern District of California aptly stated when he rejected Homeward's counsel's argument that *Cohen* and *Feaz* required dismissal of that case, "if this were the rule, 'it would grant unfettered license to mortgage servicers to mark-up the charges for force-placed insurance with no limit whatsoever.'" *Perryman v. Litton Loan Servicing, LP*, No. 14–CV–02261–JST, 2014 WL 4954674, at *12 (N.D.Cal. Oct. 1, 2014). Thus, there are genuine disputes of material fact regarding whether Homeward prioritized its financial interests over its duties to Plaintiffs and the other Florida borrowers to act in a commercially reasonable manner.

### 5. *Ms. Martorella as a Plaintiff*

In this Court's March 18, 2013, Order and Opinion Denying Defendants' Motion to Dismiss, the Court noted that Ms. Martorella "agrees that the FDUTPA only allows for recovery of 'actual damages' and not for 'consequential damages.'" DE 60 at 10. Defendants argue now that because all the LPI charges Defendants made to Ms. Martorella's escrow account have been fully refunded, Ms. Martorella's claims should be dismissed because she has not suffered any "actual damages."

Ms. Martorella responds that this statement is "factually and legally incorrect." She states that in February 2006, $4,771 was deducted from her escrow account for LPI, and only $367 of those charges was refunded. Pls. SOF ¶¶ 11, 13–14. This left Ms. Martorella with a net charge of $4,404 which has never been refunded and is still being carried on the balance of Ms. Martorella's escrow account today.[7] Pls. SOF ¶¶ 7–9, 11, 13–14.

Ms. Martorella also points out that Defendants' position in this case, that all LPI charges have been wiped out, is inconsistent with the position that they have taken in Ms. Martorella's foreclosure action, where Defendants are seeking to recover the escrow shortage, which was attributable to the LPI. Stewart Ex. 17 at ¶ 12. Thus, although Homeward deleted most of the LPI charges from Ms. Martorella's

---

**7.** Homeward argues that this was two years before Homeward came into existence, and so Homeward could not have caused that alleged injury. Ms. Martorella argues that under the Bankruptcy Order approving Homeward's purchase of the assets from Old American Home, Homeward remains subject to any claims and defenses that are related to a consumer credit transaction or consumer credit contract. DE 162–5 at 15, ¶ 4.

escrow, genuine issues of fact remain regarding whether a portion of those charges remains as a debt in the foreclosure action against her. Ms. Martorella claims that $2,850.98 of the $5,528.82 sought in Homeward's April 16, 2009 default notice to Ms. Martorella is attributable to November 2008 LPI charges. Pls. SOF ¶ 31.

Ms. Martorella also asserts that Defendants did not cancel $17,053.25 in LPI charges until long after she retained counsel and asserted class claims to enforce her rights and the rights of a class of Florida borrowers under FDUTPA.[8] Pls. SOF ¶¶ 44–48, 50–53. It appears those reversals were prompted by Ms. Martorella's class claims and were in effect, an effort by Defendants to "pick off" Ms. Martorella as a class representative. The Eleventh Circuit recently rejected such attempts to pick off a named plaintiff, holding that such efforts do not moot the plaintiff's individual or class claims. *See, Stein v. Buccaneers,* LP, 772 F.3d 698, 702–09 (11th Cir.2014) ("The relation-back doctrine allows a named plaintiff whose individual claims are moot to represent class members not because the named plaintiff has moved to certify a class but because the named plaintiff will adequately present the class claims and unless the named plaintiff is allowed to do so the class claims will be capable of repetition, yet evading review. And when, as here, the relation-back doctrine applies, certification relates back not to the filing of the motion to certify but 'to the filing of the complaint.' " *id.* at 707 citing *Sosna v. Iowa,* 419 U.S. 393, 402 n. 11, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) and *Swisher v. Brady,* 438 U.S. 204,

213–14, n. 11, 98 S.Ct. 2699, 57 L.Ed.2d 705 (1978)).

Finally, Ms. Martorella argues that while Defendants tried to reverse the LPI charges during the course of this litigation, they did not compensate her for any attorneys' fees, which she claims she is entitled to recover under Fla. Stat. § 501.211(2). *Democratic Republic of the Congo v. Air Capital Grp., LLC,* 614 Fed.Appx. 460, 468 (11th Cir.2015) ("The law now allows 'a person who has suffered a loss as a result of a violation' of the FDUTPA to recover 'actual damages, plus attorney's fees and court costs.' "). In Defendants' Response to Plaintiff's Objection to the Magistrate Judge's Report Recommending Denial of Plaintiff's Motion for Leave to File an Amended Complaint, Defendants acknowledged that "canceling Ms. Martorella's charges did not give her all the relief she seeks, so cannot moot her claims." DE 166 at 12, n.11. Given that concession, and because genuine issues of material fact remain regarding whether Homeward owes Ms. Martorella for any wrongfully placed insurance premiums, the Court rejects is Defendants' argument that summary judgment should enter in their favor because Ms. Martorella has not suffered any actual damages.

### 6. *Injunctive Relief under FDUTPA*

██ Devoting a single paragraph to this argument, Defendants argue that the Court should grant summary judgment on Plaintiffs' claim for injunctive relief under FDUTPA because there is no "continuing irreparable injury" to Ms. Martorella be-

---

8. This is in contrast to the cases cited by Defendants where the charges at issue had been reversed or returned to plaintiffs before they filed suit. *Jones v. TT of Longwood, Inc.,* No. 606CV651ORL19DAB, 2007 WL 2298020, at *1 (M.D.Fla. Aug. 7, 2007) (down payment returned in full before suit filed); *Haun v. Don Mealy Imps., Inc.,* 285 F.Supp.2d 1297 (M.D.Fla.2003) (deposit returned before suit filed).

cause Defendants have reversed all the premiums they charged to her escrow account, and any injury to the other Plaintiffs would have been only monetary.

Beyond the matter discussed just above where the Court concludes that "genuine issues of material fact remain regarding whether Homeward owes Ms. Martorella for any wrongfully placed insurance premiums," FDUTPA provides:

> Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

Fla. Stat. § 501.211(1). Plaintiffs cite one case that addresses Defendants' contention:

> We also conclude that the plaintiffs' claims for declaratory and injunctive relief should be certified for class litigation under rule 1.220(b)(2). Powertel maintains that injunctive relief is not available because the trade practice at issue will not cause continuing harm to the named plaintiffs or to the class of existing Powertel customers. However, this argument appears to be at odds with the applicable remedy provision in the Deceptive and Unfair Trade Practices Act, as well as the general purpose of the Act.
>
> Section 501.211(1), Florida Statutes is broadly worded to authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers who filed the suit.
>
> * * * * *
>
> The statute is clear on its face. It merely requires an allegation that the con-

sumer is in a position to complain (that he or she is aggrieved by the alleged violation) and that the violation has occurred, is now occurring, or is likely to occur in the future. Nothing in the statute requires proof that the declaratory or injunctive relief would benefit the consumer filing the suit.

> This reading of section 501.211(1) is consistent with the overall purpose of the Deceptive and Unfair Trade Practices Act. The Act is designed to protect not only the rights of litigants, but also the rights of the consuming public at large. *See* § 501.202(2), Fla. Stat. (1999); *Sarkis v. Pafford Oil Co., Inc.*, 697 So.2d 524 (Fla. 1st DCA 1997); *Delgado v. J.W. Courtesy Pontiac GMC Truck, Inc.*, 693 So.2d 602 (Fla. 2d DCA 1997). It follows that an aggrieved party may pursue a claim for declaratory or injunctive relief under the Act, even if the effect of those remedies would be limited to the protection of consumers who have not yet been harmed by the unlawful trade practice.

*Davis v. Powertel, Inc.*, 776 So.2d 971, 975 (Fla.Dist.Ct.App.2000). Therefore, Defendants' argument that the Court should grant summary judgment on Plaintiffs' claim for injunctive relief because there is no "continuing irreparable injury" to Ms. Martorella, and any injury to the other Plaintiffs would be monetary, is rejected.

### 7. *Breach of Contract*

In support of Homeward's motion to dismiss the amended complaint, (DE 213 at 17–20), and its motion for summary judgment (DE 256 at 16–17), Homeward argued that it could not be held liable for breach of contract because it was not a party to the mortgage and was acting as an agent of lenders, relying on the "funda-

mental principle here . . . that an agent is not liable for it's principal's contractual obligations." Motion to Dismiss at 18. In opposition to those motions, Plaintiffs maintained that as a loan servicer, Homeward was delegated the contractual responsibility for the maintenance of insurance coverage on borrowers' loans and that there were, at a minimum, disputed issues of fact about whether there was an agency relationship between Homeward and the trusts which held the mortgages. Plaintiffs' Opposition to Defendants' Motion to Dismiss Claims of Plaintiffs Graham and Wright (DE 226 at 15–18); Plaintiffs' Opposition to Defendants' (Third) Motion for Summary Judgment (filed under seal) at 11–14. However, in its "HAZARD INSURANCE LENDER PLACED POLICY COVER LETTER", Homeward asks borrowers to "[p]lease note that your security instrument (mortgage or deed of trust) gives American Home Mortgage Servicing, Inc. *the contractual right* to collect such interest and establish an escrow account." DE 253–2 at 80 of 87 (emphasis added).

At the May 13, 2015 hearing, Homeward's counsel reiterated "[w]e are the agent of the contracting party" and "it is black letter law" that the agent for a contracting party cannot be sued for breach of contract. 5/13/2015 Tr. at 29. Homeward's counsel also argued that there are "no facts showing any kind of an assignment or assumption by the servicer of those contractual rights." *Id.* at 30.

During the May 13, 2015 hearing, Plaintiffs' counsel made an oral motion for leave to supplement the record to submit the Servicing Agreement which would shed light on these issues. *Id.* at 44–46. Plaintiffs' oral motion was granted by the Court's Order Granting Motion to Supplement the Record dated June 1, 2015 (DE 325).

Having reviewed the Servicing Agreement between, among others, Defendants Deutsche Bank National Trust Company, as indenture trustee for American Home Mortgage Investment Trust 2006–1, and American Home Mortgage Servicing, Inc. (Homeward), *it is clear that Homeward may be sued for breach of contract as an independent contractor.* Section 3.01 is titled "Servicer to Act as Servicer." The third paragraph of (a) specifically disclaims the agency relationship that Homeward has argued it held as loan servicer in an effort to avoid contractual liability for its actions. *See* DE 327–1 at 8 of 41:

> The relationship of the Servicer (and of any successor to the Servicer under this Agreement) to the Master Servicer and the other parties hereto under this Agreement is intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent . . .

In addition, sections 3.01, 3.07, 3.08 and 3.11 detail the duties and obligations affirmatively assumed and undertaken by Homeward in its role as loan servicer for the Mortgage, which specifically includes the maintenance and payment of insurance coverage on borrowers' loans and the collection of payment from borrowers for insurance. Section 3.01(a) broadly authorizes Homeward, as the Servicer, to take such actions as are necessary to ensure the servicing and administration of the Mortgage Loans in accordance with the standards of an institution prudently servicing mortgage loans for its own account.

Sections 3.07, 3.08 and 3.11 more specifically lay out Homeward's obligations with respect to the maintenance and reimburse-

ment for hazard insurance. *See, e.g.,* Section 3.07 (authorizing servicer to withdraw funds from protected accounts to reimburse itself for the costs of hazard insurance); Section 3.08 (authorizing servicer to maintain servicing accounts, *inter alia,* the collection of insurance premiums); Section 3.11(a) (requiring servicer to maintain hazard insurance for each mortgage loan); Section 3.11(b) (requiring servicer to deposit any amount collected for hazard insurance into protected accounts which are subject to withdrawal pursuant to Section 3.07.)

The only other argument made by Homeward is to repeat the same argument rejected earlier in this opinion, namely that Homeward did not cause the LPI rates to increase, it told Plaintiffs that LPI would be more expensive, and it continuously reminded them that they could cancel LPI at any time by purchasing their own insurance. Defendants' Motion for Summary Judgment on Plaintiffs' breach of contract claim is denied.

***Florida Consumer Collection Practices Act***

 Defendants' last argument is that the Court should grant summary judgment on Ms. Martorella's claim [9] for violation of the Florida Consumer Collection Practices Act ("FCCPA"). The FCCPA prohibits a party from collecting a debt when it "knows that the debt is not legitimate." Fla. Stat. § 559.72(9). To plead a FCCPA claim, a party must allege "knowledge or intent by the debt collectors in order to state a cause of action." *Reese v. JPMorgan Chase & Co.,* 686 F.Supp.2d 1291, 1309 (S.D.Fla.2009) quoting *Kaplan v. Assetcare, Inc.,* 88 F.Supp.2d 1355, 1363 (S.D.Fla.2000)). Ms. Martorella alleges

that Defendants violated the FCCPA because they "knew or should have known . . . that [she] already had adequate insurance" when they asked her to pay for the insurance coverage they arranged." Am. Compl. ¶ 174.

Defendants state that Ms. Martorella's insurance expired on September 8, 2008 and it wasn't until July 3, 2009, when Ms. Martorella faxed an insurance certificate confirming renewal on July 3, 2009, that Homeward affirmatively knew that Ms. Martorella had insurance. Defendants assert it is undisputed that Homeward did not attempt to collect premiums after this July 3, 2009 date. "Because Defendants did not attempt to collect premiums after they knew Ms. Martorella had insurance," Defendants argue they are entitled to summary judgment on the FCCPA claim.

Defendants "facts" reiterated above are hotly disputed. Ms. Martorella claims that the evidence shows that Defendants knew that she had insurance through her homeowners' association as early as September 2005, and that Homeward continued its debt collection efforts even after July 3, 2009. Pls. SOF $ $27–53; Resp. to Defs. SOF $18. This disputed evidence precludes summary judgment on Ms. Martorella's FCCPA claim.

### CONCLUSION

In accordance with the conclusions made herein, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [DE 256] is DENIED.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 5th day of August, 2015.

---

**9.** Ms. Wright and Ms. Graham do not assert an FCCPA claim.